SAVOY, Judge.
This is a suit under the state Workmen’s Compensation Act, LSA-R.S. 23:1021 et seq., filed by plaintiff against his employer, Oscar Sylvester, and his insurer, Southern Farm Bureau Casualty Insurance Company, for total and permanent disability at the maximum weekly compensation rate, and also for attorney’s fees, penalties, and medical expenses.
The trial court, without assigning any written reasons, rendered judgment for plaintiff as prayed for only against Southern Farm Bureau Casualty Insurance Company, and rejected plaintiff’s demand for attorney’s fees and penalties.
*388 Defendant appealed to this Court asking that the judgment of the trial court be amended so as to reduce the number of weeks plaintiff was entitled to compensation, reducing the amount per week granted to him by the trial court, and also reducing the medical expenses for services rendered to plaintiff by Dr. R. E. Dupre.
Plaintiff did not appeal from, the judgment of the lower court, nor did he answer the appeal, consequently, the claim against Oscar Sylvester is not before the Court.
It is the contention of defendant that Andrew Moreau has entirely recovered from his injury and was able to return to work on April 30, 1956. There is no question but that plaintiff was injured on the job. Shortly thereafter, he saw Dr. Dupre, a surgeon and general practitioner, of Ville Platte, Louisiana, who placed him in the Dupre Clinic at Ville Platte, treating him with medicines, injections, heat and electronic treatments for a period of eleven days. Dr. Dupre diagnosed plaintiff’s injury as a lumbosacral strain with spasm of the muscles of the right side, extending upward over the right kidney. On December 7, 1955, Dr. Dupre referred plaintiff to Dr. James Gilly, an orthopedic surgeon, of Lafayette, Louisiana. Dr. Gilly found a straightening of the lumbar curve, limitation of motion and muscle spasm in plaintiff’s back. He also noted high arches in both feet, with short heel cords and hamstrings. He prescribed a lumbosacral corset and shoe corrections, as well as out patient medication and diathermy. Dr. Gilly examined plaintiff on six occasions, the last being July 30, 1956. On April 23, 1956, Dr. Gilly found no objective evidence of disability and felt that plaintiff was able to resume his former work, and that he had recovered from the back sprain of November 26, 1955. In an examination on July 30, 1956, Dr. Gilly reaffirmed his findings of April 23, 1956.
Dr. Dupre also sent plaintiff to Dr. J. M. Edelman, a specialist in neurosurgery, in Baton Rouge, Louisiana, on April 30, 1956. After examining plaintiff, Dr. Edelman found no disability which could have resulted from the injury of November 26, 1955, and recommended that plaintiff return to work.
The plaintiff was also examined by Dr. George B. Briel, an orthopedic surgeon of Lake Charles, Louisiana, on May 23, 1956. Dr. Briel found that plaintiff had some disability in his low back. He recommended that plaintiff be fitted with a back support and thought that after a period of four to eight weeks that plaintiff could be placed on postural exercises to build up his general posture, and this would enable him to discard his brace and go back to work.
Counsel for plaintiff states that there is a conflict in the testimony of Dr. Briel and Dr. Dupre on one hand and that of Dr. Gilly and Dr. Edelman on the other hand, and that because of this, the evidence adduced by the lay witnesses should be given great weight.
However, this Court has noted a pertinent part of Dr. Briel’s testimony under cross-examination, which begins at page 197 of the transcript, to-wit:
“Q. Now, do you say that from his history and from your examination of him you judge that he had received a lumbosacral injury? A. That was my impression, yes.
“Q. And, specifically, the injury consisted apparently of a strain, is that right? A. That is what the usual lumbosacral injury is, is strain.
“Q. That was your conclusion? A. That was my feeling, although as I said, I had found no obj ective evidence of it at the time I examined him.
“Q. As a matter of fact, Doctor, what objective symptoms of injury did you find, if any? A. At the time he was definitely protecting his lower back, he was definitely holding it *389 tight and even on X-rays he showed a definite flattening of the lordotic curve, which is suggestive of extrinsic muscle spasm.
“Q. But that is not conclusive of muscle spasm, is it? A. Well, I don’t think any of them are conclusive, I mean the only thing you have to go by is your feel and what you can .see.
“Q. You couldn’t see any muscle spasm in his back when you actually examined him? Didn’t you say that in your report? A. I said he was holding the back tight, but that the back would let up. In other words, the spasm wasn’t so complete that it was maintained constant.
“Q. Didn’t you state in your report of this examination to Mr. Nilas Young, his attorney, headed May 25th, I quote: ‘At the present time I can find no objective evidence to indicate any residual of this strain’? A. Yes.
“Q. Wasn’t that a correct conclusion of your findings? A. Of the lumbosacral strain?
“Q. Yes, sir. A. Yes. That is what I feel, that there was nothing there to indicate any evidence of an injury.
“Q. Or the consequences of the injury? A. Well, the only thing I could find was the changes which apparently were present in the X-rays, plus what clinical findings—
“Q. What were those changes, Doctor? A. Changes in the X-rays, it was definitely, as I said, it definitely showed flattening of what should have been a normal sway back, and moderately advanced posterior narrowing of the lumbar 5 — Sacral 1 interspace. He has some slipping of the apophyseal facets.
“Q. What joint is that? A. Apo-physeal joints, apophyseal facets.
“Q. Now, Doctor, would you consider those conditions changes from what? A. I considered them as due to his posture.
“Q. That probably existed prior to the accident, did it not ? A. Probably did, although I had no way of telling.
“Q. Then what changes do you refer to when you say that the X-rays indicated certain changes, changes from what to what? A. I mean that the changes are from normal to what I found in the X-ray.
“Q. But how do you know that there was actually any change in his back at the time you examined him from what it had been four, five or six years ago? A. I didn’t say that there was any change from five or six years before. I said these changes are changes from normal. They are not normal.
“Q. But they may have been normal so far as he is concerned from a time previous to the accident? A. They may have been.”
Then, at page 214 of the transcript, to-wit:
“Q. Now, if Dr. James Gilly of Lafayette found muscle spasm when he first examined the man several-weeks after the accident and found this muscle spasm persisting several months after the accident, and found on examination on April 23, 1956, that no evidence of disability remained, and thought that the man was able to return to work and again examined him on July 30, 1956, and found the same conditions as on April 23, 1956, since your examination was in between, how would you reconcile what you found with Dr. Gilly’s inability to demonstrate any disability whatsoever or find any objective symptoms of injury? A. As far as I can see in an *390 swering a question such as that, Dr. Gilly had been following this man over a period of time, he knew what the original injury was, he knew what the original findings were, and after those original findings disappeared Dr. Gilly said the man was completely free of his injury and that he should return to work. Now, when I examined, this man I could find, as I have already testified, no evidence of the residual injury. ('Italics added.)
“Q. Now, would the fact that Dr. Joseph Edelman, a qualified neurosurgeon of Baton Rouge, examined the man thoroughly on April 30, 19S6, and likewise could demonstrate no disability whatsoever, either neurologically or otherwise, and was of the opinion that the man was able to return to work, wouldn’t that actually reconcile the findings of Dr. Edelman, Dr. Gilly and yourself? (Italics added.) A. Yes, I could find—as I have already testified, I could find no evidence of the injury in the man.
“Q. Well, as a result of that we would conclude that there was no evidence of disability, isn’t that true? A. No, as far as the possibility of him having pain, I wouldn’t say no. The man, from my findings, could have been still having pain but whether the pain was due to a so-called lumbosacral strain which I feel positive is what Dr. Gilly made a diagnosis of originally, or whether the man was suffering from his changes in his posture and the prolonged condition there, is something which I have to leave up to you.”
This Court is of the opinion that a reading of the depositions given by Dr. Briel fails to show a substantial conflict between his testimony and that of Dr. Gilly and Dr. Edelman. Dr. Briel himself testified that within four to eight weeks after May 23, 1956, plaintiff would be able to go back to his normal work. This was confirmed by the examination of Dr. Gilly on July 30, 1956, at which time plaintiff was declared free of disability. The evidence fails to establish a causal connection between the accident of November 26, 1955, and any disability which plaintiff complains of after July 30, 1956.
Although Dr. Dupre testified that he believed the plaintiff was still disabled, he admitted that he found no objective evidence thereof such as muscle spasm and that his opinion was simply founded upon his acceptance as truthful of the plaintiff’s complaints of pain. See Tr. 112-114, 128. Although he stated that the patient’s congenitally poor posture would ‘‘somewhat retard his recovery” (Tr. 127), a careful reading of his testimony shows that this physician was unable to relate any disability past July 30, 1956, to the trauma of November 26, 1955 (Tr. 125-129). As the specialists whose opinion is entitled to great weight in the field of their specialty (Gaspard v. Fidelity and Casualty Company of New York et al., La.App. 1956, 89 So.2d 445; Anderson v. Peek, La.App. 1958, 102 So.2d 776, writs refused by Louisiana Supreme Court) likewise were unable to ascribe any disability following that date to the industrial accident, we must hold that the plaintiff has not borne his burden of proving that any disability beyond July 30th is caused by the accident in the course of his employment. See Circello v. Haas & Haynie Corp. et al., La.App.1959, 116 So.2d 144.
The Court concludes that the award granted to plaintiff for 400 weeks is excessive and it is hereby amended to grant plaintiff compensation for a period beginning November 26, 1955, and ending July 30, 1956, subject to a credit for any payments made by defendant to plaintiff.
The next complaint of defendant is that the amount of compensation granted by the trial judge, namely $30, is excessive *391 and should be reduced to $23.40. Plaintiff on direct examination testified that he worked 9 and 10 hours every day, 6 days a week, and that on some occasions he worked up to 12 hours. It is significant that the defendant who had the records available to him did not choose to submit any evidence as to the number of hours worked by the plaintiff each day. We conclude that the amount fixed by the trial judge, namely $30 per week, is supported by the evidence in the record.
Defendant contends that the medical fees of Dr. Dupre are excessive and should be reduced, citing as his authorities, Ortego v. Southern Industries Co., La.App.1956, 88 So.2d 73, and Hale v. Republic Drilling Co., Inc., et al., La.App.1959, 109 So.2d 268. The trial judge allowed Dr. Dupre $1,000 medical expenses, being the maximum allowed under the Workmen’s Compensation Act at the time the accident occurred.
Dr. Edelman, when questioned about the medical fees, stated that he would not state that the treatment given plaintiff by Dr. Dupree was unnecessary. He did state that the hospitalization of plaintiff by Dr. Dupre after his examination by Edelman was unnecessary; that the fees charged by a general practitioner seemed exorbitant. Dr. Edelman also testified that Dr. Dupre had duplicated his treatment to plaintiff, particularly in the giving of penicillin shots.
Dr. Gilly stated that the treatment given plaintiff by Dr. Dupre was not the one that he would have used. He said the charges made by Dr. Dupre were higher than he would have charged. Plaintiff was referred by Dr. Dupre to Drs. Gilly and Edelman for consultation and treatment.
It is apparent from the record that Dr. Dupre, a general practitioner, treated plaintiff for a back condition after he had referred the plaintiff to Drs. Gilly and Edel-man, a five month period in the case of Dr. Edelman.
In spite of Dr. Edelman’s and Dr. Gilly’s report that plaintiff was well, Dr. Dupre re-admitted plaintiff to his clinic and made numerous charges for drugs and also a charge of $125 for services rendered.
This Court finds that the preponderance of the medical evidence indicates that the hospitalization following April 30, 1956, was not required by any work-caused disability and that the charges therefor should not be assessed against the employer or his insurer. Accordingly, the claim for Dr. Dupre is reduced from $1,000 to the sum of $799.75.
While plaintiff did sue for attorney’s fees and penalties in his original suit, he has not mentioned this item in his brief, and the Court presumes he has abandoned this item. Be that as it may, a reading of the record convinces the Court that there was a serious dispute in this case, both as to disability and medical expenses, and that defendant’s refusal to pay the amount demanded was not capricious or arbitrary, and accordingly, the claim for attorney’s .fees and penalties is denied.
For the reasons, assigned, the judgment of the district court is amended so as to reduce the compensation granted plaintiff from 400 weeks to a period beginning November 26, 1955, and ending July 30, 1956, subject to a credit for payments made by defendant to plaintiff.
It is further ordered that the judgment of the district court be amended by reducing the medical fees of Dr. Dupre from the sum of $1,000 to $799.75, and as amended is affirmed.
The costs of this appeal are to be paid by defendant.
Amended and affirmed.